*57 Statement
MONROE, J.
Plaintiffs allege, in substance, that their son, who was nearly 19 years of age, and was employed as a brakeman, was killed, through the negligence of the defendant, upon the 29th of October, 1903; that about 4 o’clock upon the morning of that day “the engineer was backing a train of freight cars onto the scale switch track, and the said William Burton, their son, was directed by the conductor in charge * * * to uncouple the cars as they were backed to the scale track for weighing, and whilst so engaged his foot was caught in the switch, which had been improperly opened, and he was run over by the trucks of the freight car, * * * inflicting injuries from which he died; * * * that, in order to uncouple said cars, Burton had to go in between two cars while they were moving, * * * at a point where the scale track switched from the main track, and where the danger is necessarily greater than at any other point; that it was dark and cloudy, and impossible for him to see the opening of the switch; that there was no switch light burning, and no lights in the yards of the company”; that he was not notified of these dangers, and was not aware of them or capable of comprehending the same; that he was a minor, incapable of entering into contractual relations, and that defendant had no right to employ him; that the conductor was standing near, and saw him enter between the cars, without warning him, and permitted and ordered him to attempt to discharge the dangerous service of uncoupling said cars in the dark; that it was the duty of the defendant to keep its yards and switches well lighted, and the failure to do so was negligence; and they make further allegations as to the quantum of damages.
Defendant denies generally the allegations of the petition, and alleges that the injuries sustained “by plaintiffs’ deceased relative, employé of the defendant company, were due to his negligence and to the risks necessarily incident to the employment voluntarily engaged in by him.”
The transcript contains the admission that William Burton came to his death on the morning of October 29, 1903, from injuries caused by his being run over by the trucks of a freight ear while weighing cars in the defendant’s yards at Monroe. Beyond this, the facts, as we find them from the evidence, are as follows: Daniel Burton and Sallie Moore, his wife, parents of William Burton, separated in 1889, since which time the former, who leads an unsettled life as a roustabout on river boats, has exercised no control over his son. He testifies that the latter has worked for himself since he was able to go about; that (speaking of his son as at the time of his death) he was intelligent and mature in appearance — looked like a man; and that, being informed that he was employed by the defendant as a brakeman, witness did not object, because his son had to make a support, and he (witness) thought he was making an honest living.
Sallie Moore, after separating from Burton, married again, after which her son William Burton never lived with her. For eight years preceding his death she had lived in Vicksburg, and he in Monroe, and for two years prior to his death she had not seen him. She had known for about two months that he was working for the defendant, and had made no objection, because, as she says, the defendant had no agent in Vicksburg. Her son contributed to her support.
At the time of his death, William Burton, according to the testimony of his parents' as to the date of his birth, lacked about two months of being 19 years old, and was quite competent to support and take care *58 of himself. He had the appearance of a man of from 22 to 25 years of age, and there is nothing to show that the defendant knew or had any reason to suppose that he was a minor. He had been working for defendant for about 9 months, and was considered a competent brakeman. When the accident occurred, he, with the train crew to which he belonged, was engaged in weighing freight ear's on a scale situated on what is called the “scale switch track” in the defendant’s yards at Monroe. A car had been placed on the scale and weighed, and was to be removed by being attached to a freight train, consisting of a locomotive and some 15 cars. The crew engaged in the work were the engineer and fireman, the conductor, the head brakeman, and Burton. It was dark, and each of the three last-mentioned was provided with a lantern to enable him to see and to signal. Burton was near the scale, and it was his duty to signal for the train to back, and, at the proper moment, for it to stop, and his signals were to be repeated by the head brakeman, who was several ear lengths away, in the direction of the locomotive; the idea being that the train should back until the rear car should couple automatically with the car standing on the scale; that Burton should then couple the air pipes or hose of the two cars by pressing their ends together, after which the train should move out, taking with it the weighed car. The cars were provided with automatic couplers, which could be uncoupled by means of levers from the sides of the cars, so that it was unnecessary for the brakeman to go between them either to couple or to uncouple. The air pipes, conveying the air by which the brakes were controlled, hung down over the middle of the tracks, from the end of each car, to about 10 or 12 inches from the ground, and in order to couple them it was necessary for the brakeman to go between the cars, and, taking a pipe in each hand, press the ends together. The uncontradieted evidence is that, according to the rule of the defendant, and to the instructions given to the employSs generally, and to Burton specifically, no one was to go between moving cars for any purpose whatever, but, when it became necessary to get into that position, should do so only when the cars were standing still. A moment before the accident, Burton signaled, with his lantern, for the train to back, which it did, at the rate of about two miles an hour. A moment later the head brakeman, observing that Burton’s lantern had disappeared, and perhaps hearing a cry from him, signaled for the train to stop, which it did immediately. Upon investigation, Burton was found with his body lying upon the outside of the track, and his legs crossing to the inside, and one of them so tightly wedged between the rails of the switch and main tracks that it was necessary to use a crowbar or some similar instrument to extricate him. He died within an hour or two, without explaining how it happened that he got . into that position, and no one else has explained it. The end car of the backing train was found coupled by the automatic couplers to the car on the scale, and the air pipes between the two ears were also coupled. Burton had been run over by the forward truck (as the train moved) of the end car of the train, and the train had moved but about 4 feet afterwards. Neither the conductor, who was some 50 feet away, nor the head brakeman, who was at a greater distance, had seen Burton go between the cars. There was but little light in the yard, and (though testimony on this subject was objected to) the rails were not “blocked.” These are about all the facts disclosed by the record, save that one of the shoes of the deceased was badly tom, either from having been forced between the *59 rails of the switch and main tracks, or in the effort to extricate it from that position.
Opinion.
The proof does not, on material points, sustain the allegations of the petition. The deceased was not engaged in uncoupling ears at all, nor can it be said that he was engaged in coupling them, save that his duty was to stand near where the ears (the end car of the train and the car on the scale) were to come together (coupling automatically), and signal to the engineer to back or move forward as the occasion required. Nor is there any evidence going to show that the switch had been improperly opened. Whether his foot was caught between the rails before he fell, or was knocked down, no one can say. It seems to us more likely that, having stepped in between the moving train and the standing car for the purpose of coupling the air pipes, and having accomplished his mission, he fell or was knocked down in attempting to get out, and that his leg and foot were forced into the position in which they were found by the flanges of the wheels which ran over them. In any event, the testimony is direct and uncontradieted to the effect not only that it was unnecessary for him to go between the ears whilst they were in motion, and no part of his duty to do so, but that there was a rule of the company and that he was instructed to the contrary. Under these circumstances, we are constrained to hold, as we assume the trial judge held, that the injury complained of resulted from the assumption by the deceased of a risk that he was not called on to assume and had been instructed not to assume, and not from the negligence of the defendant. Beyond this, although technically he was a minor, the deceased was sufficiently intelligent and had had sufficient experience to justify his employment, even had it been shown that the defendant was aware of his minority.
Judgment affirmed.